*455 TEXTO COMPLETO DE LA SENTENCIA
Comparece ante nos, María de Lourdes Torres Flores, en adelante, la apelante, solicitando la revisión de una Sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan. Mediante dicho dictamen, el tribunal a quo adjudicó la custodia de la menor Natalia Guzmán Torres a su padre Wilberto Guzmán Alvarado, en adelante, el apelado.
Por las razones que expresamos a continuación, se confirma la Sentencia apelada.
I
Conforme surge del recurso ante nuestra consideración, las partes sostuvieron una relación consensual. De dicha relación, nació la menor el 23 de marzo de 1995. 
El 3 de octubre de 1996, la apelante solicitó un aumento en la pensión alimentaria. Sostuvo que la pensión alimentaria estipulada no cubría las necesidades de la menor, solicitando al Tribunal de Primera Instancia impusiera una pensión alimentaría de $1,500.00 mensuales. (Véase, págs. 30-31 del Apéndice.)
El apelado interpuso alegación responsiva. A su vez, presentó reconvención alegando que la apelante estaba interfiriendo con las relaciones paterno-filiales. (Véase, págs. 33-34 del Apéndice.)
El Tribunal de Primera Instancia refirió el caso a la Oficial Examinadora de Pensiones Alimentarias, quien recomendó una pensión alimentaria de $1,118.00. El tribunal a quo emitió dictamen acogiendo el Informe rendido por la Oficial Examinadora. (Véase, pág. 36 del Apéndice.) Posteriormente, dicho foro estableció un plan de relaciones paterno-filiales provisionales, así como refirió el caso al Programa de Relaciones de Familia para evaluación y recomendación.
Alegadamente, tras iniciarse las relaciones paterno-filiales, surgieron desavenencias entre las partes con respecto a este asunto, lo que motivó al apelado presentar una “Moción Solicitando Desacato'”. A su vez, y en respuesta a lo anterior, el 1 de mayo de 1997, la apelante interpuso escrito intitulado “Moción Urgente Solicitando Orden”. Entre los asuntos planteados en el escrito, la apelante le señaló al foro de instancia que el apelado, sin su consentimiento, había acudido a la Oficina del pediatra de la menor. En dicha visita, se alegó *456 que el apelante le había solicitado al galeno el récord médico de la menor. Ante la negativa del médico, “montó en cólera”, remitiéndole después una “carta amenazante”. (Véase, págs. 37-39 del Apéndice.)
Tras ciertos trámites procesales, el 15 de octubre de 1997, se celebró una vista donde se modificaron las relaciones paterno-filiales. Asimismo, surge de la Minuta que el magistrado de instancia señaló que las partes debían recibir ayuda y orientación a fin de mejorar su comunicación.
Así las cosas, el 5 de febrero de 1998, se celebró una nueva vista. La Trabajadora Social del Programa de Relaciones de Familia recomendó que la apelante retuviera la custodia de la menor y que las partes continuaran recibiendo ayuda profesional. Surge de la Minuta que no existió controversia en cuanto a este extremo. Sin embargo, entre las partes había controversia en cuanto al aspecto de si se debía conceder la patria potestad compartida. Asimismo, surge de la Minuta que el tribunal a quo ordenó a la Trabajadora Social evaluar las relaciones de la menor con el apelado para que lo interpretara conforme a su mejor criterio profesional, sin intervención alguna de las partes.
Las partes se sometieron a un proceso de mediación con el Dr. Ramón Cuevas Natal, psiquiatra de familia, quien rindió el Informe correspondiente.
Luego de ciertos trámites procesales, el 17 de noviembre de 1999, se celebró una vista donde se le informó al Tribunal de Primera Instancia que las partes habían llegado a varias estipulaciones. Entre los acuerdos allegados estaban, entre otros, los siguientes:

1. El pago de la pensión mensual aumentará a la cantidad de $1,400.00 prospectivamente desde el mes de diciembre de 1998.

2. Se renuncia al derecho de reclamación de honorarios de abogado y pago retroactivo por el aumento.

3. El demandado [apelado] reclamará en su planilla los pagos de pensión que haga a su hijo.

4. La demandante [apelante] hará las gestiones para conseguir un apartamento entre $90,000 a $100,000, que sea de su agrado y con el visto bueno del señor [apelado] para que éste [apelado] compre y sirva de residencia para la señora [apelante] y la menor en cuyo momento se estaría rebajando la pensión a $1,000.00, por los otros $400.00 sería la aportación por no tener que pagar renta.

5. La señora [apelante] no adquirirá derecho alguno sobre el apartamento como tampoco adquirirá el derecho a hogar seguro.

6. La señora [apelante] residirá en el apartamento mientras ella quiera y en caso de que decida abandonar el mismo, el demandado [apelado] tendrá un período adicional de tres meses para pagar los $1,000.00 para entonces venderse el apartamento, sin que la señora [apelante] pueda pedir revisión durante ese período por el cambio de vivienda.

7. El demandado [apelado] reclamará en su planilla los intereses correspondientes a los pagos de hipoteca. No se fija término para esta compra, por lo que solicita sea efectivo la rebaja de pensión, en el momento que se compre el apartamento.

8. La patria potestad será compartida, no obstante su cliente continúa con el interés de reclamar custodia.

*457
9.Las relaciones paterno-filiales serán en fines de semana alternos de sábado a las 12:00m., hasta domingo a las 6:00 p.m.

10. La menor pasará un día en la semana con el padre [apelado] y pernoctará. Por tal razón, el padre [apelado] llevará a la menor escuela [sic]. Este día será acordado entre las partes.

11. En cuanto al período de navidad, no hay acuerdo. 

Todos estos acuerdos son de carácter provisional hasta que se dilucide el aspecto de custodia. ”

Véase, págs. 51-53 del Apéndice.
El Tribunal de Primera Instancia, a su vez, acogió estos acuerdos de manera provisional.
Luego de otros incidentes procesales, el 18 de julio de 2000, se celebró una nueva vista. En la misma, el apelado reiteró su deseo de continuar el caso con relación a la custodia de la menor. Asimismo, la apelante^ solicitó como gasto adicional los costos de educación de la menor. A esta petición, se opuso el apelado alegando que dichos gastos estaban contemplados en las estipulaciones allegadas por las partes previamente. El foro de instancia en su determinación dejó el asunto pendiente. Asimismo, ordenó a la Trabajadora Social del Programa de Relaciones de Familia le informara lo acontecido en el caso desde sus inicios, en particular sobre las evaluaciones efectuadas a las partes. (Véase, págs. 54-58 del Apéndice.)
Luego de ciertos trámites procesales, el 7 de diciembre de 2000, la apelante interpuso escrito intitulado “Moción de la Parte Demandante [Apelante] para Impugnar y Cuestionar la Probidad del Demandado [Apelado] para ser Acreedor de la Custodia de la Menor”. Expuso, como razones, para oponerse a la solicitud del apelado las siguientes:

a) El demandado [apelado] no ha podido ejercer sus funciones de padre preocupado por el bienestar de su hija, al no haber podido ejercer la patria potestad compartida y atender las relaciones paterno-filiales que le permitió ejercer el Tribunal; lo que queda plenamente demostrado: (1) porque no ha podido o querido estar con su hija por los pasados 18 meses, y (2) porque no ha podido o no ha querido ejercer la función de patria potestad compartida para la selección de la escuela a la que debió haber asistido su hija, y (3) no pudo, siquiera, prestar su anuencia para que esta asistiera a una escuela escogida por la madre.

b) El padre [apelado] no ha visitado todavía -a pesar de que estamos ya terminando el primer semestre escolar-, la escuela a donde su hija recibe el pan de la enseñanza, sea porque: (1) no tiene el tiempo para dedicarlo a su hija porque lo dedica íntegramente al ejercicio de su profesión, o (2) porque no le interesa el bienestar escolar de su hija.

c) El demandado [apelado] no está actualmente casado y, como tal, no tiene un hogar debidamente constituido y estable al cual llevar a la niña cuando esté con él, si el Tribunal le concede 'él privilegio de custodia compartida.

d) Al presente, los familiares más cercanos del demandado [apelado], a quien este [sic] podría confiar la custodia temporera de la menor, mientras trabaja, viven en pueblos lejanos de la zona metropolitana y hasta donde sabemos, ningún miembro de su familia se relaciona bien con la menor; de hecho, la abuela de la niña nunca la procura.

*458
e) El demandado [apelado] alega estar continuamente ocupado atendiendo los asuntos relacionados con el ejercicio de su profesión, como para dedicarle unos minutos a su hija; independientemente a que esta [sic] esté en el hospital o cuando ella lo visitaba en su propia oficina.

f) Durante el año 1999-2000, el demandado [apelado] instigó una investigación del Departamento de la Familia, a través de terceros, aduciendo que la madre maltrataba a la hija, lo que provocó una investigación con el propósito de hacer un expediente, lo cual demuestra su deseo de causar daño y de ganar favores a través de procedimientos totalmente infundados, demostración de que puede estar sufriendo trastornos mentales.

g) En momento alguno, durante los últimos 24 meses, el demandado [apelado] se ha interesado en cómo vive la menor y su madre en el apartamento que es de su propiedad, de donde está a punto de ser desahuciada porque no paga el mantenimiento que corresponde a ese, lo cual parece hecho a drede [sic] para que, eventualmente, la echen del mismo.

h) El demandado [apelado] ha llegado al extremo de utilizar los recursos del tribunal para minar la conciencia de sus recursos y tomar ventaja en la evaluación que de este caso le ha confiado el tribunal a sus recursos; esto lo ha hecho en varias ocasiones, comunicándose con esos recursos por carta en una de las cuales indispuso a la demandante [apelante].

5. Además de que no tiene un hogar constituido, el demandado [apelado] tiene actualmente varias personas del sexo opuesto con las cuales se relaciona y comparte su vida, a cuyas residencias o apartamentos llevó la niña en varias ocasiones, en algunas de las cuales la niña llegó para atrás marcada, sea por golpes, o quemaduras, que ella -a su corta edad-, no podía explicar, esas marcas; sin embargo, eran en forma y naturaleza consecuencia -aparente- de quemaduras de cigarrillo, fuere en forma directa o por descuidos de las personas con quien ese [apelado]dejaba la niña.

i) La situación ha llegado a tal extremo de que el padre “chantajeaba" a la niña cuando estaba con ella, fuere retratándose con ella o llevándola a sitios donde otras personas la retrataban, para luego mostrar las fotos y demostrar su gran aprecio por la niña, cuando -en realidad- lo que estaba era haciendo un expediente del cual beneficiarse cuando llegara el momento.

j) La niña ha llegado a tal situación en que ahora muestra aversión a la presencia y trato con su padre, porque éste nunca le ha llevado un juguete -siquiera- durante las navidades o en su día de cumpleaños.
Véase, págs. 63-64 del Apéndice.
A tales efectos, argumentó que el apelado no tenía interés en compartir la custodia, sino en “mortificar” a la apelante.
El 17 de enero de 2001, se celebró una vista sobre el estado de los procedimientos. Entre lo determinado, el tribunal a quo refirió a ambos padres al Taller de Padres y Madres para Siempre. El 23 de marzo de 2001, se celebró una vista evidenciada. En la misma, se estableció la capacidad de la Trabajadora Social del Programa de Relaciones de Familia como perito. Se le ordenó a dicha funcionada que realizara gestiones para que la menor recibiera una evaluación siquiátrica en la Clínica de Diagnóstico del Tribunal. El foro de instancia resolvió dejar la custodia provisional de la menor a la apelante. (Véase, págs. 67-69 del Apéndice.)
Así las cosas, el 4 de mayo de 2001, en la vista de seguimiento, se llegaron a unos acuerdos en cuanto a las relaciones paterno-filiales. (Véase, págs. 73-75 del Apéndice.) Por su parte, el 21 de junio de 2001, la *459 Trabajadora Social del Programa de Relaciones de Familia sometió escrito intitulado “Moción Informativa del Programa de Relaciones de Familia”. Expresó dicha funcionada, a saber, Marie Gordillo, qué ninguno de los profesionales que atendían el caso se oponía a las relaciones paterno-filiales. Sin embargo, planteó que todos los profesionales estaban trabajando la situación desde la perspectiva de su cliente. A tales efectos, solicitó al tribunal a quo ordenara una reunión a fin de establecer un plan de ayuda. (Véase, págs. 76-77 del- Apéndice.)
El 11 de diciembre de 2001, se celebró una nueva vista. Surge de la Minuta que la apelante estaba impidiendo las relaciones paterno-filiales. El foro de instancia ordenó se reanudaran- las mismas, so apercibimiento de arresto. (Véase, págs. 83-87 del Apéndice.)
A la vista del 22 de enero de 2002, no compareció ni la apelante ni su abogado. Ante el pedido del apelado de que se le concediera la custodia provisional de la menor, el tribunal apelado celebró una vista. La prueba testifical consistió de Marie Gordillo, Trabajadora Social del Programa de Relaciones de Familia, y del apelado. Se sometieron, a su vez, las evaluaciones siquiátricas del Dr. Harry Valcárcel Báez, Siquiatra de la Clínica de Diagnóstico del Tribunal.
Mediante Resolución emitida al efecto el 22 de enero de 2002, notificada en igual fecha, el Tribunal de Primera Instancia declaró Con Lugar la petición del apelado señalando que la apelante “ha demostrado una completa indiferencia a cumplir con las órdenes de este Tribunal y pone en riesgo la salud emocional de la menor”. (Véase, pág. 89 del Apéndice.)
Insatisfecha, la apelante presentó reconsideración del dictamen emitido. En vista celebrada el 20 de febrero de 2002, el Tribunal de Primera Instancia, entre otros extremos, denegó reconsiderar su dictamen. Aclaró dicho foro que su determinación no descansaba sólo en cuanto al incumplimiento de la apelante sino en su función de parens patrie. (Véase, págs. 95-99 del Apéndice.)
Luego de otras vistas celebradas, el Tribunal de Primera Instancia emitió Resolución, el 4 de abril de 2002, reiterando su determinación de que la custodia provisional de la menor la tendría el apelado. Señaló el foro de instancia, entre otros extremos, y que por su importancia transcribimos:

Basamos nuestra determinación anterior, luego de evaluar el testimonio de la Trabajadora Social Marie Gordillo y ante la ausencia, no justificada, de la parte demandante [apelante] y el incumplimiento de varias órdenes.

Luego de evaluar la prueba presentada, el testimonio de Marie Gordillo en ambas vistas y los informes sociales preparados por ella presentados, concluimos:

“Desde el año 1997 hasta mayo de 2001, la Trabajadora Social Marie Gordillo ha rendido 7 informes sociales, relacionados con la petición de relaciones paterno-filiales y posterior de custodia presentados por Guzmán Alvarado [apelado] en este caso.

La menor Natalia es producto de una relación consensual entre las partes. Tiene 7 años de edad y este pleito lleva alrededor de seis años. Todo este tiempo, lamentablemente, esta niña ha estado inmersa en los conflictos de sus padres.

Desde el primer informe hasta el último, la posición de Torres Flores [apelante] ha sido la de no favorecer, 
*460
no permitir y obstaculizar las relaciones paterno-filiales. Lo que provocó que Guzmán Alvarado [apelado], entendiera que existe maltrato sicológico a la menor y haya presentado una petición de custodia.

Desde que se inició la controversia legal hasta el presente, encontramos entre las partes desconfianza mutua, malas relaciones y cada uno culpando al otro de los incidentes que ocurren.

Entre los incidentes más significativos encontramos que la señora Torres Flores [apelante] le negó a Guzmán Alvarado [apelado] que su hija fuera alérgica a algún medicamento al solicitarle una receta médica para Natalia. A su vez, prohibió que este [sic] [apelado] pudiera examinar el expediente médico pediátrico. Lo que puso en riesgo la salud de la menor, si este [sic] [apelado] le hubiese recetado un medicamento contraindicado.

Desde los inicios del caso se recomendó por la Trabajadora Social que las partes recibieran ayuda médica en el campo de la salud mental.

Guzmán Alvarado [apelado] recibió ayuda profesional y fue dado de alta. Torres Flores [apelante] ha indicado que recibe ayuda profesional de la Oficina de Asistencia de la Mujer del Municipio de San Juan; no obstante, se ha negado ofrecer más información al respecto.

En 1998, se rindieron varios informes al Tribunal, y la situación continuaba igual. Los padres no cooperaban entre sí. Se establecieron planes de relaciones paterno-filiales, los cuales no se cumplían. Se utilizaron diferentes sitios para entregar a la menor, entre ellos frente a un guardia de seguridad para poder determinar quién decía la verdad. El resultado fue igual, seguían las diferencias entre los padres y no se daban las relaciones paterno-filiales.

De la investigación de la Trabajadora Social surge que era Torres Flores [apelante] la que cambiaba las condiciones para la entrega, lo que provocaba las diferencias entre ellos.

En adición, Torres [apelante] condicionaba las relaciones paterno-filiales a que no estuviera la compañera sentimental de Guzmán [apelado], petición que no le concedieron.

Otra condición que exigía Torres Flores [apelante] era que la primera esposa de Guzmán [apelado] estuviera en las relaciones paterno-filiales, lo cual no fue aceptado por ésta.

Torres Flores [apelante] alegaba que existía orden de protección a su favor y contra Guzmán [apelado], lo cual no era cierto.

En otra ocasión, Torres Flores [apelante] alegó que Guzmán Alvarado [apelado] había quemado a Natalia lo cual no fue validado por la Trabajadora Social, y el Juez que atendió el asunto tampoco se manifestó sobre el particular.

En fin, todo este tiempo Torres Flores [apelante] decía que no se oponía a las relaciones paterno-filiales, pero con sus mentiras y con su conducta entorpecía las mismas.

El Informe presentado el 10 de noviembre de 1998 evalúa la petición de custodia de Guzmán Alvarado [apelado]; Torres Flores [apelante] a esta fecha continuaba oponiéndose a las relaciones paterno-filiales.

La menor, a su vez, manifestaba que le gustaba estar con papá, que éste la visitara en la escuela, aunque era “malo”. No sabía porque éste era malo. No querría que su mamá supiera que a ella le gustaba estar con papá. En los dibujos de la familia, siempre excluía al padre, la razón era porque éste molestaba a su mamá. 
*461
Vemos claramente el conflicto de lealtades que siente esta menor. Ante el hecho de querer compartir con su padre, pero no lo puede manifestar porque su mamá le ha dicho que es malo y ella no le quiere hacer sufrir.

Para esa fecha, todavía la recomendación de la Trabajadora Social era que la custodia la tuviera Torres Flores [apelante] aunque condicionada la misma a que ésta no obstaculizara las relaciones paterno-filiales y recibiera tratamiento sicológico.

En mayo 2001, la recomendación de la Trabajadora Social seguía siendo la misma, aunque el conflicto entre los padres continuaba igual. A esa fecha, la Trabajadora Social Marie Gordillo, valida el conflicto de lealtades de la menor y el maltrato emocional a que ha expuesto a la menor; evidenciada por la actitud de la menor hacia el padre, porque su mamá no permite lo contrario. Por lo que recomendó que Torres Flores [apelante] tenía que cesar todo intento de enajenar la niña de la figura paterna. Torres Flores [apelante] nos presenta un resentimiento contra Guzmán Alvarado [apelado], el cual canaliza, obstruyendo las relaciones paterno-filiales.

Torres Flores [apelante] llegó al extremo de tratar de impedir una entrevista conjunta entre la menor, papá y la Trabajadora Social. En cuanto a sus datos personales, ha informado alrededor de tres fechas de nacimiento (una el año 1961, 1964 y 1969). Negó haber sido casada antes de la relación con Guzmán Alvarado [apelado].

Sin entrar en las razones, encontramos que Torres Flores [apelante] ha tenido varios trabajos, varias residencias, la menor ha asistido alrededor de cuatro instituciones entre cuido y colegio y ha sido evaluada o ha visitado más de cuatro profesionales de la salud mental. Definitivamente creemos que todos estos factores afectan grandemente en el desarrollo social y/o emocional de cualquier niño de siete años.

Razón por la cual creemos prudente mantener la custodia provisional de Natalia en Guzmán Alvarado [apelado]. Máxime cuando entraremos a dilucidar en sus méritos la petición de custodia, donde tendremos el beneficio del testimonio de varios peritos de las partes y del Tribunal.

Tenemos que aclarar que aunque la testigo Marie Gordillo declaró sobre las evaluaciones siquiátricas y sicológicas de las partes, no las hemos considerado a los efectos de esta resolución, ya que tendremos en las próximas vistas como testigos a los profesionales que rindieron dichos informes y será entonces cuando haremos las conclusiones correspondientes.

En esta vista, Marie Gordillo se reafirmó en que Guzmán Alvarado [apelado], estaba capacitado para ejercer la custodia. De Torres Flores [apelante] opinó lo mismo; que puede tener custodia, pero que tiene que facilitar las relaciones paterno-filiales y continuar bajo tratamiento sicológico.”
(Véase, págs. 117-120 del Apéndice.)
Celebradas múltiples vistas sobre el estado de los procedimientos del caso, y luego de numerosos trámites procesales, los cuales incluyeron una moción intitulada “Objeción a Informe Final” y un establecimiento de las relaciones materno-filiales para diferentes fechas, el juicio en su fondo se pautó para el 19 de agosto de 2002. La misma fue, posteriormente, reseñalada.
El 21 de octubre de 2002, a la vista señalada comparecieron las licenciadas Carmen P. de León Rivera y Mercedes Martínez Valiente en calidad de Defensoras Judiciales de la menor. El 13 de febrero de 2003, las Defensoras Judiciales de la menor presentaron escrito objetando la prueba pericial del apelado, a saber, Dr. Argelio López Roca. Dicha objeción descansó en lo dispuesto en la Reglas 26-A de Evidencia y 23.1(a) de las de Procedimiento Civil. Argüyeron que las partes no tenían derecho a obtener información alguna respecto a las *462 comunicaciones entre la menor y dicho profesional por ser materia privilegiada.
Sobre este asunto, surge de la Minuta de la vista de 20 de febrero de 2003, lo siguiente:

Para efectos del caso, se hizo constar que el doctor López Rosa es el perito que brinda servicios terapéuticos a la menor. Sin embargo, de éste no ser el terapeuta de la menor, podría fungir como perito de papá. No obstante, de haber alguna conversación privilegiada, no podría serlo. Inclusive, se advirtió a los abogados que el doctor López Rosa fue autorizado como Perito-Asesor del licenciado Vélez Arcelay [representante legal del apelado]; razón por la cual se le permitirá que declare como perito nombrado por el Tribunal. No obstante, cuando éste entre a declarar como terapeuta de la menor se detendrá su testimonio, ya que las representantes legales de la menor han objetado renunciar al privilegio del médico-paciente. Sin embargo, se permitirá al doctor López Rosa testificar sobre todo lo que conozca o haya investigado con relación a las evaluaciones a la menor. ”

Véase, Minuta de 20 de febrero de 2003.
Posteriormente, la apelante volvió a objetar. Surge de la Minuta de 26 de febrero de 2003, que el Tribunal de Primera Instancia mantuvo su determinación de que el doctor López Rosa declarara como perito, no como terapeuta.
El 31 de octubre de 2003, se permitió la intervención del Departamento de la Familia. Esta agencia, conforme surge de la Resolución emitida, intervino en una querella instada. A tales efectos, se solicitó la suspensión de las relaciones materno-filiales. La apelante interpuso moción oponiéndose e intimando que el tribunal a quo había abusado de su discreción al haber suspendido las relaciones materno-filiales.
El 20 de noviembre de 2003, notificada en igual fecha, el Tribunal de Primera Instancia emitió el dictamen apelado. Mediante el mismo, dicho foro concedió la custodia permanente de la menor al apelado. A su vez, denegó la petición del apelado de que se le privara de la patria potestad a la apelante. Aquilatada la prueba testifical y pericial, dicho foro determinó las siguientes conclusiones de hechos las cuales transcribimos in extenso:

“El promovente Guzmán [apelado] es un médico, especialista en cardiología. En el 1994 conoció a la promovida Torres [apelante], ya que ésta trabajaba como sonografista cardiovascular.

Ambos eran solteros por razón de divorcio, aunque Guzmán [apelado] mantenía una relación consensual con Margarita Ramírez. Guzmán [apelado] tenía 31 años y Torres [apelante]alrededor de 34 años de edad.

Luego de haber salido en 3 ó 4 ocasiones, Torres [apelante] sale embarazada y se lo comunicó a Guzmán [apelado] El embarazo no fue deseado; por tal razón, las partes llegan a un acuerdo de terminar el embarazo. Por lo que Guzmán [apelado] le da dinero a Torres [apelante]para que se realizara un aborto.

Luego de esto, Guzmán [apelado] no vuelve a ver a Torres [apelante]; ésta cambia de empleo y de residencia. Guzmán [apelado] no sabe de ella por varios meses, por lo que cree que el aborto se realizó.

Torres [apelante]por su parte, no se realizó el aborto y en el mes de marzo de 1995 nació Natalia. Por lo que Torres [apelante] le reclamó a Guzmán [apelado] la paternidad de la niña y éste se negó, ya que tenía dudas de que Natalia fuera su hija.

*463
Por tal razón, Torres [apelante], presentó una denuncia a tenor con el Art. 158 del Código Civil lo que conllevó que Guzmán [apelado]fuera citado o arrestado en su Centro de Trabajo.

Estos incidentes están aún latentes en los sentimientos que generan entre ambos.

Guzmán [apelado] no le perdona a Torres [apelante] que los alguaciles le fueran a arrestar en el Centro Cardiovascular y Torres [apelante] a su vez, no le perdona que haya negado la paternidad y no hubiese establecido un hogar con ambas. Por lo que las partes no tienen comunicación y cada uno se culpa de la situación pasada y todas las presentes. El resentimiento que conserva Torres [apelante] contra Guzmán [apeladoJ se refleja en la custodia que ejerció sobre su hija y se mantiene latente durante el proceso judicial.

La desconfianza hacia el otro es un denominador común entre ambos, lo que ha propiciado desacuerdos en aspectos de cuido y salud de la menor.

Los primeros seis años de Natalia estuvo bajo la custodia de Torres [apelante], actualmente lleva casi dos años bajo la custodia de Guzmán [apelado] Prácticamente, desde que Natalia nació, las partes han estado litigando activamente este caso y al analizar los procedimientos antes de quedar sometido este caso, encontramos que la demora en la tramitación del mismo se debió grandemente, a las posiciones asumidas por Torres [apelante], al no estar preparada en varias ocasiones para vista y cambiar sus posiciones una vez calendarizados los asuntos.

El caso comenzó con una petición de alimentos por parte de Torres [apelante] y una reclamación consistente de Guzmán de que se estableciera relaciones paterno-filiales, ya que Torres [apelante] interfería en la mismas y controlaba las mismas a su antojo.

El asunto de la pensión alimentaria no ha producido grandes controversias; no obstante la interferencia de Torres [apelante] en las relaciones paterno-filiales produjeron alrededor de 8 mociones, antes de que se le otorgara a Guzmán [apelado] la custodia provisional de la menor.

Durante el tiempo que Guzmán [apelado] estuvo pasando pensión alimentaria, encontramos que fue un padre responsable y cumplió con las disposiciones correspondientes. Las veces que Torres [apelante] alegó que éste estaba en desacato por no pagar pensión alimentaria, no prevaleció.

Desde que Guzmán [apelado] tiene la custodia provisional de Natalia, no ha habido problemas con las relaciones materno-filiales y ha cumplido con las mismas.

Guzmán [apelado] reside y ha residido con Margarita Ramírez desde antes del nacimiento de Natalia.

Ramírez es médico, con especialidad en endocrinología, es Catedrática en la Escuela de Ciencias Médicas de la Universidad de Puerto Rico. Natalia reside con ambos.

Ramírez actualmente tiene un rol importante en el cuido de Natalia, como pareja han hecho los arreglos sobre quién lleva y busca la menor al Colegio, realiza las tareas escolares y la lleva al dentista.

Definitivamente, Ramírez es quien más se ocupa de dicha tarea. Actualmente, Ramírez es la figura femenina de apego más significativa en Natalia.

Residen en una propiedad de Ramírez, no obstante Guzmán [apelado] tiene en planes la construcción de una residencia donde todos irían a residir.

*464
La pareja Guzmán [apelado] Ramírez os una pareja estable, y prevalece en dicho hogar una buena relación entre todos los integrantes, entiéndase Guzmán [apelado], Ramírez y Natalia. La comunicación y el respeto mutuo prevalece.

Ramírez declaró que cuando supo del nacimiento de Natalia, se afectó y se disgustó, terminó perdonando a Guzmán [apelado]y aceptando primero a Natalia y luego queriéndola.

Debido a los problemas en las relaciones patemo-filiales, no intervino en la misma. Para evitar percances con Torres [apelante], quien ni siquiera la mira, no creyó prudente exponerse y exponer a la menor.

La relación entre Ramírez y Natalia es una sincera, enmarcada en el amor, respeto y confianza.

Natalia actualmente tiene ocho años y estudia en el Colegio Espíritu Santo de Hato Rey. Estuvo bajo la custodia de Torres [apelante] en los primeros seis años de vida. Durante este tiempo, Torres [apelante] utilizó a su hija para manipular las relaciones patemo-filiales. Por lo que Natalia está inmersa en los asuntos legales y ha sido víctima de dicha conducta. Lo cual la lleva a tener un gran conflicto de lealtades hacia ambos padres. La niña conoce la posición de ambos padres y se manifiesta y se comporta según las circunstancias presentes. Por eso muchas veces contesta y actúa ante los peritos según lo que sus padres quieren que ella actúe y diga lo que éstos quieren escuchar.

Hay manifestaciones de Natalia, ante las Trabajadoras Sociales del Tribunal, y los peritos del Tribunal, el Dr. López Roca, de que mamá le dijo que mintiera sobre la conducta de papá hacia ella; que se porte mal en la escuela, que saque malas notas, que no respete a Ramírez entre otros.

Definitivamente esta acción de Torres [apelante] constituye maltrato sicológico a Natalia.

La conducta de Natalia en los centros de cuido y en la educación pre-escolar, la podemos describir como una niña traviesa, que mordía a sus compañeros de grupo y no seguía las normas del grupo.

Esa conducta de Natalia fue mejorando; no podemos pasar por alto que Natalia ha estado bajo tratamiento médico (terapias) con el Dr. López Roca, siquiatra de niños, todo este tiempo.

Desde que Natalia está bajo la custodia de Guzmán [apelado], su conducta ha mejorado, ya no presenta agresión, ni rabietas en el Colegio; sus notas han mejorado. Las ausencias y tardanzas de Natalia eran significativas cuando estuvo bajo la custodia de Torres [apelante]; actualmente no hay problemas de ausencia y tardanzas.
Natalia es descrita por Guzmán [apelado] y Ramírez de la siguiente forma: “una nena feliz, contenta, que siempre esta haciendo chistes y está muy a gusto en su hogar.”

Es descrita por Torres [apelante] de la siguiente forma “una niña voluntariosa, imponente y manipuladora”.

Ante el conflicto de lealtades que Natalia presenta, ya que ama a ambos padres y aunque quisiera que vivan juntos, sabe que no es posible; ésta quiere que el pleito termine y ella quiere estar en el “cielo. Donde hay paz, amor y libertad. Siendo en la Tierra dicho lugar, el hogar de Guzmán [apelado]y Ramírez. ” 

María de Lourdes Torres [apelante], actualmente es enfermera graduada. Desde que nació Natalia ha tenido varios trabajos, y cambio de residencia. Lo que a su vez promovió cambios en los lugares de cuido de la 
*465
menor. Entiende que debe tener la custodia de su hija porque la tiene desde que nació, es una madre responsable y está capacitada para tenerla ya, que le ha provisto todas sus necesidades. No cree que Ramírez deba cuidar a su hija, ya que ésta tuvo un hijo y no lo crió.

Actualmente, Torres [apelante] tiene 42 años de edad. Traemos este dato, porque todo el tiempo que este caso ha estado bajo evaluación encontramos que Torres [apelante] ha ofrecido varias fechas de nacimiento. A cada profesional le dio información diferente sobre el particular. Las fechas de nacimiento ofrecidas oscilan entre el 1961 al 1969. Aceptó haber dado información distinta por vanidad femenina.

El status social de Torres [apelante] es divorciada. Sobre el particular encontramos que al preguntarle sobre sus datos personales nunca mencionó a los profesionales que la entrevistaron que había sido casada, previo a la relación con Guzmán [apelado].

Igualmente, encontramos que mintió al llenar las Planillas Económicas, donde alegó bajo juramento que pagaba alquiler por residencia, cuando vivía en un apartamento provisto por Guzmán [apelado].

Al contestar las preguntas a que fuera sometida en el contrainterrogatorio por el abogado de Guzmán [apelado], se mostró evasiva y contestaba con un “no recuerdo ”.

Sobre sus mentiras y/o testimonios diferentes contestó que mentir es bueno o malo dependiendo de la circunstancias. En fin, las circunstancias (obtener la custodia de su hija, es el fin) por lo que, por obtener el mismo, puede ser bueno mentir.

Torres [apelante] recibe terapia en la Comisión de Asuntos de la Mujer. Dichas terapias están basadas en que ésta es víctima de violencia doméstica por parte de Guzmán [apelado]

Al evaluar la totalidad de las circunstancias de este caso, entendemos que Torres [apelante] no ha sido víctima de violencia doméstica.

No creemos que Guzmán [apelado] haya amenazado de muerte a Torres [apelante], ni que haya intentado agredirla. El hecho de Guzmán [apelado] haber negado la paternidad de Natalia cuando supo de su embarazo y nacimiento, no es un acto de maltrato. Tenemos que ver el caso desde su justa perspectiva.

Dos adultos, sobre los treinta años, profesionales, divorciados, tienen una relación consensual. Donde el amor y promesa de vida conyugal están ausentes. Relación que podemos catalogar de irresponsable por ambas partes, donde no tomaron las precauciones para evitar un embarazo no deseado.

Tanto Guzmán [apelado] como Torres [apelante] tienen que asumir las consecuencias de sus actos, de una forma responsable.

La paternidad y la maternidad de Natalia no puede estar enmarcada en el resentimiento; ni en lo que pudo haber sido y no fue. Ambos padres, además de proveerle a Natalia sus necesidades básicas, tienen que proveerle un ambiente de respeto, confianza y garantizarle que recibirá amor filial de cada uno de ellos.

Torres [apelante] no es víctima de Guzmán [apelado], sino de sus propias actuaciones. Al no ser víctima de maltrato por parte de Guzmán [apelado], y recibir terapia dirigida a fortalecerla y darle las herramientas para poder evitar dichas actuaciones, entendemos el porqué las mismas no han sido efectivas. Torres [apelante] no ha recibido terapias dirigidas a evitar que obstruya las relaciones patemo-filiales.

*466
Las terapias han sido dirigidas a una persona que alegó ser víctima de maltrato, y está basada en hechos falsos o distorsionados. No obstante, la terapista declaró que la terapia y los resultados no dependen de la veracidad de los hechos, sino de lo que la paciente le informó.

A tenor con todo lo anterior, descartamos los hallazgos y recomendaciones de la Sicóloga Alicia Méndez. ”

Los hallazgos de los peritos del Tribunal son los siguientes:
La Trabajadora Social Marie Gordillo validó que Natalia está inmersa en el conflicto de los padres. Que Tomes [apelante] ha obstaculizado las relaciones patemo-filiales; que es su interés en que la niña no comparta con el padre y su compañera, por lo que durante toda su intervención recomendó que Torres [apelante] tenía que recibir ayuda profesional, ya que Tomes [apelante] tenía que cesar en el intento de enajenar la figura paterna.
Que no hay razón por la cual papá no puede ejercer la custodia. En adición, éste ofrece mayor estabilidad a Natalia, tanto en el aspecto económico, como de vivienda, como en lo emocional y favorece las relaciones materno-filiales.
Que Natalia mintió en cuanto a su relación con papá, debido a la influencia de mamá. Ya que ésta le decía que tenía que mentir. Torres [apelante] no acepta que ha entorpecido las relaciones paterno-filiales; en todo momento ha prevalecido su coraje o resentimiento contra Guzmán [apelado],
Gordillo se reafirma en la recomendación de sus siete informes y recomienda la custodia a Tomes [apelante] y que se someta a ayuda profesional, para lidiar con su problema.
La Trabajadora Social Nilda Rosa rinde un informe donde recomienda la custodia a Guzmán [apelado]. Por haber Torres [apelante] obstaculizado por años las relaciones patemo-filiales y no poder separar la relación sentimental que tuviera con Guzmán [apelado], de la relación del padre de la menor. Por otra parte, en el hogar de Guzmán [apelado], Natalia ganó mayor estabilidad emocional, paz y tranquilidad; en adición, en dicho hogar se garantizan y facilitan las relaciones materno-filiales.
No obstante, luego de una reunión entre los Peritos del caso, cambió su recomendación para favorecer a Tomes [apelante] como la persona que debía tener la custodia de Natalia. La única razón que ofreció para tal cambio, era que Natalia había pasado más tiempo con su madre que con Guzmán [apelado],
Dr. Harry Valcárcel, Siquiatra, luego de evaluar a ambos padres, los encuentra capacitados para ejercer la custodia. El mayor problema es la problemática de poder por la custodia de Natalia y recomienda que se inicie tratamiento para que pueda haber buena comunicación y se puedan subsanar las dificultades del pasado. Siendo necesario que Natalia desamolle una actitud de reconocimiento y respecto sobre ambas figuras de autoridad, ya que no es saludable para Natalia tener que mentir ante la mamá, lo que siente por su papá.
El Dr. Luis Feliciano en su informe recomendó custodia compartida, ya que ninguno de los padres está incapacitado para ejercer custodia; no obstante, se unió al consenso de los peritos y recomendó custodia a Tomes [apelante]. Enfatiza que lo más importante es que las partes dejen la guerra que existe entre ellos y reciban terapia para lidiar con la situación existente.
Luego de haber entrevistado y evaluado a las partes, el Dr. Hugo Román, Sicólogo, recomienda custodia a mamá. No obstante indica que Torres [apelante] necesita tratamiento sicológico individual, no así Guzmán [apelado]. Este debe ser integrado a nivel de terapia familiar. En cuanto a Tomes [apelante], no indica que ésta no reconoce que haya obstaculizado las relaciones paterno-filiales, ya que entiende que ha estado protegiendo a *467 la menor del padre. Encuentra a Torres [apelante] más afectada que Guzmán [apelado] por los estresores del caso, por lo que es necesario que reciba terapia individualizada. El proceso de ayuda terapéutica que ha recibido aparenta no haber sido el mejor. Tiene que haber un compromiso genuino de ésta de recibir las terapias y tiene que haber un reconocimiento de los errores para la modificación de la conducta.
Torres [apelante] proyecta unos indicadores que sugieren desconfianza de su medio ambiente, hostilidad asociada a problemas familiares, rasgos depresivos, irritabilidad y ansiedad.
Torres [apelante] no acepta la paternidad, o sea, el rol paterno de Guzmán [apelado] y presenta una actitud no responsable con su rol materno.
A pesar de lo anterior, no encuentra que sicológicamente Torres [apelante] esté incapacitada para ejercer la custodia de Natalia, pero si su condición no se trata, “puede desarrollar otra cosa”.
Sobre Guzmán [apelado], nos indica que está más receptivo a recibir ayuda para mejorar las relaciones con la madre de su hija. Que ha trabajado el conflicto mejor que Torres [apelante]. Que tiene mayor estabilidad y no presenta cuadro patológico que lo incapacite para tener la custodia de Natalia.
En cuanto a Natalia, nos dice que está influenciada por su entorno al medio ambiente y por conflicto de lealtades. Que Ramírez es una figura significativa en su vida y por eso le llama su segunda mamá, pero a su vez, está reconociendo que tiene una mamá. En el área escolar ha presentado una mejoría positiva, al igual que en el ajuste al hogar paterno.
Recomienda la custodia a mamá, ya que entiende que no hay base para quitarle la custodia y porque tuvo a la niña por seis años.
La Trabajadora Social Idalia Colón valida las determinaciones de hechos anteriores; no obstante, recomienda la custodia a Torres [apelante], por ser ésta la madre de la menor. Habiendo una madre, no hay que darle a Natalia a otra madre. Aunque no encuentra que Torres [apelante] esté en mejor posición que Guzmán [apelado], la custodia debe ser de ésta por su condición de madre. Es su opinión que, aun cuando una madre haya maltratado a su hijo, hay que darle servicios y ayudas y mantenerle la custodia.
Descartamos sus recomendaciones por entender que las mismas son discriminatorias y presenta un discrimen por razón de género.
El Dr. López Roca, Siquiatra Pediátrico, nos señala que la continuidad en el cuido es un factor importante y la calidad de cuido es otro factor importante; ambos términos son complementarios. La interferencia en el cuido puede tener un efecto negativo o positivo. Si se interfiere en la continuidad del cuido para prevenir un maltrato, el efecto es positivo. Si se interfiere para evitar que se de unas relaciones patemo-filiales, es negativo. En el cuido de Natalia, hubo hace dos años un cambio. Habiéndose adaptado Natalia y habiendo mejorado en sus relaciones interpersonales con los compañeros de escuela, haber subido las notas, el cambio fue uno positivo. También ha sido significativo y positivo, la calidad de cuido.
Entiende que si no hay introspección y la persona entiende que no ha pasado nada, habiendo pasado, no se le debe dar custodia; este es el caso de Torres [apelante].
Encontró en Natalia preferencia a estar con papá y que mamá no lo sepa. Natalia ha pedido confidencialidad para decir un secreto, ya que por su experiencia sabe que lo que va a decir le puede traer repercusiones.
*468 Natalia ha sido constante en que desea que papá y mamá se lleven bien, que sean amigos.
Tanto Guzmán [apelado] como Torres [apelante] necesitan ayuda terapéutica para mejorar su relación.
En el proceso de evaluación, Natalia tuvo un episodio de regresión total y manifestó su temor a que Torres [apelante] supiera de sus afectos hacía Guzmán [apelado] y Ramírez. También corroboró que Natalia estaba siendo manipulada por Torres [apelante], ya que la presionaba para que no manifestara afecto hacia Guzmán [apelado].
Desde que Natalia está bajo la custodia de Guzmán [apelado] no ha presentado problemas con las relaciones materno-filiales; por eso recomienda que siga bajo su custodia y que Torres [apelante] reciba por un siquiatra especializado en relaciones de familia. Es necesario que Torres [apelante] trabaje su resentimiento y coraje por hechos que ocurrieron en el pasado.
En cuanto a la preferencia de la menor, nos dice que está más cómoda emocionalmente con Guzmán [apelado]. Este no le crea conflicto de lealtades y no está sujeta a presiones.
En su rol de evaluador, el Dr. López Roca tuvo la oportunidad de conocer a Natalia en un ambiente controlado por espacio de dos años. Categóricamente concluye que Torres [apelante] presionaba a la niña para que no manifestara afecto hacia Guzmán [apelado] o Margarita.
Otro perito que prestó testimonio lo fue el Dr. Víctor García Toro, perito en el campo de Trabajo Social, Doctor en Sociología y especialista en la conducta humana. Entre sus hallazgos señalamos:

“1. que ambos padres han sido evaluados sicológica y siquiátricamente y han participado de algún tipo de terapia.

2. ninguno tiene impedimento para ejercer rol de padre y madre.

3. Torres [apelante] se observa deprimida y angustiosa por el proceso judicial. Guzmán [apelado], al contrario, ha optado una reacción re-activa al proceso judicial.

4. En cuanto a Natalia, es una niña inteligente y está tratando de lidiar con la situación que le ha tocado vivir en la mejor forma posible. ”

Lo primero que se encuentra en Natalia es que no quiere que Torres [apelante] sepa, lo que ella dice y siente sobre Guzmán [apelado] y Ramírez.
Esta situación es demasiado delicada para su edad. En adición, ha sido manipulada por parte de Tomes [apelante] y no hay garantías que cese, de tener a la menor.
Torres [apelante] no es la mejor opción por ser madre; ni Guzmán [apelado] es mejor opción por ser un buen proveedor económico.
Por lo que Torres [apelante] debe recibir ayuda de un siquiatra y mientras tanto las relaciones materno-filiales deben ser supervisadas.
En cuanto al factor de continuidad de cuido y calidad de cuido, entiende que la continuidad tiene un gran peso, cuando tiene calidad. Natalia ha tenido una mejor calidad en el cuido, en el tiempo que ha estado con *469 Guzmán [apelado]. Se evidencia por sus notas, las cuales han mejorado significativamente. Por su conducta y comportamiento con sus amiguitos de Colegio.
A base de lo anterior, y conforme reseñado, el Tribunal de Primera Instancia concedió la custodia permanente de la menor al apelado.
Inconforme con dicha determinación, la apelante recurre ante este Tribunal. Contando con el beneficio de ambas comparecencias, incluyendo un alegato suplementario de la apelada, y la Transcripción de la Prueba, procedemos a resolver.
II
En su recurso, la apelante plantea que incidió el Tribunal de Primera Instancia al descartar las recomendaciones de los peritos designados como peritos judiciales así como los de la defensora judicial en cuanto a que la apelante está capacitada para ejercer la custodia de la menor y descansar en los testimonios de los peritos del apelado para concederle la custodia a éste mediando prejuicio, pasión y parcialidad de dicho foro; al concluir que en el tiempo en que la apelante tuvo a la menor bajo su custodia la utilizó para manipular las relaciones paterno-filiales; al determinar que la apelante ha sometido a la menor a maltrato psicológico; al admitir como perito del apelado al terapeuta de la menor, sobre la objeción de la defensora judicial y de la apelante, a pesar de que la primera hizo saber que no renunciaba al privilegio médico-paciente; y al haberla privado de la custodia de la menor desde enero de 2002, por su incomparecencia a una vista.
III
El Tribunal Supremo de Puerto Rico ha expresado que en casos como el de autos el norte a seguir es si el dictamen llegado responde al mejor bienestar del menor. Este es el principio cardinal que debe guiar a los tribunales. Maldonado v. Burris, 154 D.P.R. _ (2001), 2001 J.T.S. 72; Sánchez Cruz v. Torres Figueroa, 123 D.P.R. 418 (1989); Nudelman v. Ferrer Bolívar, 107 D.P.R. 495 (1978); Centeno Alicea v. Ortiz, 105 D.P.R. 523 (1977); Marrero Reyes v. García Ramírez, 105 D.P.R. 90 (1976).
El Art. 107 del Código Civil de Puerto Rico dispone, en lo pertinente:

“En todos los casos de divorcio, los hijos menores serán puestos bajo el cuidado y la patria potestad del cónyuge que el tribunal, en el ejercicio de su sana discreción, considere que los mejores intereses y bienestar del menor quedarán mejor servidos; pero el otro cónyuge tendrá derecho a continuar las relaciones de familia con sus hijos, en la manera y extensión que acuerde el tribunal al dictar sentencia de divorcio, según los casos.

31 L.P.R.A. see. 383.
En el ejercicio de su discreción, el tribunal debe considerar, entre otros factores, la edad del menor, su sexo, salud mental y física, preferencia, habilidad de las partes para satisfacer las necesidades afectivas, económicas y morales del menor y la interrelación del menor con los padres. Ex-parte Torres Ojeda, 118 D.P.R. 469 (1987); Nudelman v. Ferrer Bolívar, supra; Marrero Reyes v. García Ramírez, supra.
Asimismo, el Tribunal Supremo ha expresado sobre cómo debe hacerse la determinación judicial en casos de custodia de menores:
“Ningún factor es de por sí decisivo. Hay que sopesarlos todos para juzgar de qué lado se inclina la balanza y al menos aproximarse al logro de la solución más justa en un asunto de tan extrema dificultad. ” Marrero Reyes v. García Ramírez, supra, a la pág. 106.
*470 Maldonado v. Burris, supra.
Dicho Foro ha hecho numerosos pronunciamientos en torno al citado precepto. En los mismos, ha concedido gran discreción al tribunal sentenciador para la determinación de las relaciones de familia, las cuales no serán modificadas en apelación, salvo en casos en que se demostrare abuso en el ejercicio de dicha discreción. Gorbea v. Látimer, 34 D.P.R. 204 (1925).
Estamos conscientes de que la mayoría de los casos de familia están revestidos de un gran contenido emocional por plantear controversias de índole afectiva. Reyes Torres v. Collazo Reyes, 118 D.P.R. 730, 732 (1987).
Una decisión de cambio de custodia o patria potestad no puede ser el producto del capricho o improvisación. Santana Medrano v. Acevedo Osorio, 116 D.P.R. 298 (1955). Salvo circunstancias extraordinarias, una parte a quien el tribunal inicialmente ha concedido la custodia de sus hijos menores no debe ser despojada de tal custodia en forma sumaria y sin ser escuchada. Id. Los tribunales, al amparo de su poder de parens patrie, tienen facultad para rechazar un acuerdo o estipulación de los cónyuges en acción de divorcio respecto a la patria potestad y custodia de los hijos menores, si se convencen de que tal acuerdo no conviene a los mejores intereses de los menores. Id. A los efectos de emitir una decisión sobre la patria potestad y custodia de unos menores, los tribunales pueden ordenar la comparecencia de cuanta persona pueda ayudarle en el descargo de su delicada misión y puede, asimismo, ordenar aquellas investigaciones de índole social que entienda procedentes y convenientes. Id.
Abundando al respecto, el Tribunal Supremo recientemente ha señalado:
“(l)a decisión de un tribunal en tomo a la custodia de un menor ‘‘es una a la que se debe llegar luego de realizar un análisis objetivo, sereno y cuidadoso de todas las circunstancias presentes en el caso ante su consideración, teniendo como único y principal objetivo el bienestar de los menores”. Santana v. Osorio, 116 D.P.R. 298, 301 (1985), énfasis suplido. Ello, a partir del Artículo 107 del Código Civil de Puerto Rico, 31 L.P. R.A. see. 383, que dispone, en su parte pertinente, como sigue: “En todos los casos de divorcio los hijos menores serán puestos bajo el cuidado y la patria potestad del cónyuge que el Tribunal, en el ejercicio de su sana discreción, considere que los mejores intereses y bienestar del menor quedarán mejor servidos...'”. La determinación de cuáles son los mejores intereses del menor está enmarcada en el derecho que éste tiene a una correcta formación física, moral y espiritual. Nudelman v. Ferrer Bolívar, 107 D.P.R. 495, 511 (1978)....
El principio de protección a los mejores intereses y el bienestar del menor delimita los contornos del poder discrecional del tribunal en este caso. En efecto, el poder para adjudicar la custodia que se encuentra en el Artículo 107 del Código Civil, supra, tiene su génesis en el ejercicio por los tribunales del poder de parens patriae, es decir, en el reconocido poder del Estado de proteger a los incapaces. El poder de parens patriae limita los derechos de otras partes, a fin de salvaguardar el bienestar de quien no puede abogar por los suyos. Es la función social y legal que el Estado asume y ejerce, en cumplimiento de su deber de brindar protección a los sectores más débiles de la sociedad. Es por ello que cualquier conflicto que un tribunal perciba entre intereses ajenos y el mejor interés de un menor deberá resolverse a favor del menor.
Ortiz García v. Meléndez Lugo, _ D.P.R. _ (2005), 2005 J.T.S. 25.
IV
Reconocemos la norma que nos mueve a abstenernos de intervenir con las determinaciones de hechos y con la apreciación de la prueba que hacen los tribunales de primera instancia, excepción hecha en los casos en que se demuestre que se actuó con pasión, prejuicio, parcialidad o que se incurrió en error manifiesto. López Vicil v. ITT Intermedia, Inc., 143 D.P.R. 574 (1997); Quiñones López v. Manzano Pozas, 141 D.P.R. 139 (1996).
*471 La regla de abstención y deferencia obedece a que ante ellos fue que declararon los testigos y fueron ellos quienes tuvieron la oportunidad de verlos y oírlos declarar. No obstante, “[e]l arbitrio del juzgador de los hechos es respetable, mas no absoluto. Una apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora de este Tribunal”. Vda. de Morales v. De Jesús Toro, 107 D.P.R. 826 (1978). Véase además, Vélez v. Srio. de Justicia, 115 D.P.R. 533 (1984); Ramos Acosta v. Caparra Dairy, Inc., 113 D.P.R. 357(1982).
Es menester recordar que lo anterior no es de aplicación en circunstancias en que la evidencia consista de prueba pericial, de documentos públicos o privados, de deposiciones, estipulaciones escritas u orales, de hechos aceptados o de hechos incontrovertidos por las alegaciones o la prueba. Sanabria v. Sucn. González, 82 D.P.R. 885 (1965). Ante esta prueba, los tribunales apelativos estamos en igual posición que los tribunales de instancia; no estamos obligados a aceptar la interpretación por ellos dada ni a aplicar la norma de abstención expuesta.
V
Examinada la normativa aplicable y los escritos y documentos que obran en el expediente, procede que la apliquemos a los hechos ante nos. En esencia, nos toca decidir si fue correcto el dictamen del Tribunal de Primera Instancia de conceder la custodia permanente de la menor a su padre, el apelado. Para tomar esta difícil decisión, debemos resolver si dicha determinación responde al mejor bienestar del menor.
La apelante plantea que incidió el Tribunal de Primera Instancia al descartar las recomendaciones de los peritos designados como peritos judiciales así como los de la defensora judicial y descansar en los testimonios de los peritos del apelado para conceder la custodia a éste. Arguye que todos los peritos de la defensora judicial y de la apelante recomendaron concederle la custodia a la apelante. Asimismo, alega que el tribunal a quo no tomó en consideración las explicaciones de la apelante por haber cambiado de empleo, para haberse mudado en varias ocasiones y para haber trasladado a la menor en tres (3) ocasiones de colegio y/o centro de cuido.
Comencemos apuntando que consistentemente el Tribunal Supremo de Puerto Rico ha resuelto que los tribunales no estamos obligados a seguir indefectiblemente la opinión, juicio, conclusión o determinación de un perito, estando en plena libertad de adoptar su propio criterio al evaluar la prueba pericial y hasta descartar la misma aun cuando resulte ser técnicamente correcta. Pueblo v. Irizarry, 156 D.P.R. _ (2002), 2002 J.T.S. 68; Dye Tex v. Royal Insurance, 150 D.P.R. 658 (2000); Culebra Enterprises Corp. v. E.L.A., 143 D.P.R. 935, 952-53 (1997); Prieto v. Maryland Casualty Co., 98 D.P.R. 594, 623 (1970).
El Tribunal Supremo ha apuntado que aunque la intervención de los peritos puede arrojar luz sobre asuntos medulares en los pleitos de custodia, su testimonio no es factor determinante. “Los pleitos de custodia no deben convertirse en una batalla entre los peritos de ambas partes, con la consecuencia de someter al menor a numerosas intervenciones. Por el contrario, la responsabilidad y la capacidad para adjudicar un pleito de custodia descansa, no en los peritos, sino en los tribunales.'” Ortiz García v. Melendez Lugo, supra.
El caso de autos han intervenido numerosos peritos de ambas partes desde el comienzo de su tracto procesal que data de 1996. En cuanto a los testimonios de ciertos de los peritos surge de la Transcripción de la Vista lo siguiente.
Marie Gordillo, Trabajadora Social del Tribunal. En esencia testificó que desde el año 1997 ha recomendado ayuda profesional para las partes, en particular para la apelante, toda vez que ésta ha mantenido un interés de no propiciar las relaciones paterno-filiales. Testificó que la menor se veía imposibilitada de informarle a los doctores que lo pasaba bien con el apelado, porque la apelante se enojaría con ella. Declaró que en sus informes reveló las dificultades para llevar a cabo las relaciones paterno-filiales y que ambas partes requerían la presencia de terceras personas para entregar y recibir a la menor. Muchos de los problemas *472 surgidos se debían a las acciones de la apelante a fin de obstaculizar las relaciones paterno-filiales. Declaró que estaba preocupada por la actitud de la apelante, ya que parecía que no sabía manejar el stress que el trámite legal le provocaba. Declaró que había notado que la apelante tenía rasgos de depresión, irritabilidad, había cambiado de hogares, de cuido de profesionales de ayuda física y emocional para la menor y estaba desorganizada.
Posteriormente, testificó que el maltrato emocional hacia la menor provenía de ambas partes, toda vez que mediante sus disputas le crean conflictos a la menor. Atestó que el ajuste de la menor al hogar paterno ha sido uno favorable, y que, de alterarse, equivaldría a otro ajuste. Declaró que la apelante no ha recibido terapia que exitosamente le haya ayudado a resolver sus sentimientos y conflictos internos por lo que si la situación no mejora recomienda la custodia al apelado. En su Informe de 2001 recomendó concederle la custodia a la apelante, con la condición de que recibiera tratamiento médico.
Dr. Hugo Román Rivera (Sicólogo Forense)- Clínica de Diagnóstico del Tribunal.- Dicho testigo declaró:

P. Le voy a pedir, por favor, que me aclare, si no es correcto, que en ese informe... de ese informe surge que en la primera página, usted informa que la cliente se muestra irritada, disgustada, poco espontánea y en estado de ánimo deprimido si eso es correcto que surge de ese informe.

R. Es correcto.

P....

P. En la página tercera usted continúa refiriendo en relación a esta misma persona, María de Lourdes Torres Flores [apelante], en su resumen de recomendaciones que esta persona se encuentra con rasgos depresivos y con sentimientos de coraje hacia el padre de la hija [apelado].

R. Es correcto.

P.... “La prueba M.M.B.I. sugiere excesiva sensibilidad a las opiniones de los demás, resentimiento, posible uso de la proyección y racionalización como mecanismo de defensa, sospecha o desconfianza de su medio ambiente, hostilidad asociada a problemas familiares, rigidez en opiniones y aptitudes, rasgos depresivos, ansiedad y posible tendencia aislamiento, irritabilidad y aparente labilidad emocional”, ¿es correcto?

R. Es correcto.

P. ¿Me puede explicar a qué se refiere con labilidad emocional?

R. Labilidad emocional, se refiere a un estado de vulnerabilidad o de fragilidad emocional que puede tener la persona en un momento dado en una casa o en un episodio de su vida ante unos estresores, por ejemplo, que pueda estar enfrentando o algún tipo de situación crónica, pues que la persona se encuentra en un estado susceptible o bien vulnerable o bien frágil emocionalmente, en ese momento.

P...

R. Bueno, la ....cuando hay labilidad emocional, puede darse situaciones donde la persona oscila los estados de 
*473
ánimo que puede tener, puede en momentos, pues sentirse bien deprimido sin energía y en otros momentos pues, ese mismo estado depresivo y de frustración, pues puede tornarse, la persona, pues, un poco irritado, hostil y forma parte dentro de un cuadro depresivo. Ya cuando eso se manifiesta en una forma donde la intensidad, la frecuencia, pues es más...mucho más significativa, y que interfiere aún más con el funcionamiento de la persona, pues se podría estar hablando de otros cuadros clínicos, pero sí, puede haber unos episodios de irritabilidad, hostilidad, que la persona tenga que puedan enmarcar de ese mismo estado de labilidad o de depresión que pueda estar pasando.

P. Y esa situación, de una persona pasando por una situación como esa o de una condición como esa, ¿qué medidas puede afectar a un menor que esté bajo su custodia?

R. Bueno, si la persona....hay que evaluar cada caso individualmente, ante ese perfil, pues se recomienda que la persona, pues se evalúe los recursos de apoyo que pueda tener y verificar que lleve algún tipo de proceso terapéutico, profesional porque si se deja desatendido y si los estresores que pueden estar causando esos indicadores, pues continúan afectando, son persistentes en el ambiente, en la situación de la persona, pues puede llegar a un momento que afecte significativamente, su funcionamiento, sus ejecutorias y en su rol también materno o paterno.

P...

R. Bueno, lo que se desprende de la entrevista con ella...estaba participando de unos procesos también de terapia familiar, luego se encontró que no fueron fructíferos. Pero, habían unos intentos, tanto a nivel familiar como individual de lidiar con la situación.

P....

P. El doctor Guzmán [apelado], en ese momento, yo no encontré lo que se llama diagnóstico de E.G.l, E.G.2, que son los diagnósticos clínicos que generalmente ameritan una atención primaria sicológica o siquiatra. ...O sea, que ameritaba, sí, algún tipo de intervención, pero a mi juicio clínico era más bien a nivel familiar, no tanto a nivel individual que la requiriera.

P. ...

P. Doctor, en adición a eso le pregunto si más adelante en ese mismo informe surge que el doctor Guzmán [apelado], incluso manifiesta que está receptivo a participar de ayuda para mejorar la relación con la madre de su hija.

R. Es correcto. ”

A su vez, declaró que ambos padres estaban cualificados para ejercer la custodia de la menor. Asimismo, testificó que había recomendado una custodia compartida entre ambos padres, lo cual fue discutido en el equipo de profesionales que evaluó a la familia. No obstante, dado el nivel de conflicto crónico existente entre las partes se entendió que no sería lo más adecuado. (Véase, pág. 62 de la Transcripción.)
Por su paite, el doctor Luis Antonio Feliciano Morales, Médico Psiquiatra en la Sala de Menores en Relaciones de Familia quien redactó tres (3) Informes, testificó que señaló en un Informe que la menor expresó que le gustaría estar viviendo con mi papá.
A la luz del extenso testimonio ofrecido no encontramos indicio alguno de parcialidad, error manifiesto, pasión o prejuicio por parte del foro de instancia. A contrario sensu, el tribunal a quo, en un caso que como bien *474 señaló la magistrada de instancia es uno difícil y complejo tomó como norte el bienestar de la menor al momento de llegar a su determinación. Del testimonio de varios de los peritos se desprende que la actuación de la apelante ha generado las situaciones ocurridas. Por otro lado, del testimonio del doctor Román Rivera se desprende que la situación de la menor, en varios aspectos, ha mejorado desde que convive con el apelado. A su vez, la menor ha expresado preferir vivir con el apelado. 
Por otro lado, los fundamentos utilizados por el foro de instancia para descartar cierto testimonio pericial en el presente caso nos parece no sólo adecuado, sino correcto. Maldonado v. Burris, supra.
Al considerar y ponderar debidamente todos los factores pertinentes, surge que es el mejor bienestar del menor concediéndole la custodia a su padre, el apelante. Contraído a lo alegado por la apelante, y conforme se desprende de los autos originales elevados ante nos, aun en este momento, y en procedimientos posteriores a esta apelación, el bienestar de la menor reside en mantener la custodia conforme establecido por el Tribunal de Primera Instancia.
En el cuarto error planteado, la apelante nos plantea que incidió el Tribunal de Primera Instancia al permitir el testimonio del doctor López Roca, aun cuando las Procuradoras de Familia objetaron al mismo e hicieron saber al foro de instancia que no renunciaba al privilegio médico-paciente. Sobre el particular, hemos examinado la transcripción de la prueba sobre el incidente y basta señalar que dicho profesional se le autorizó declarar exclusivamente como perito del papá en el campo de siquiatría de niños y adolescentes. Sin embargo, no se le autorizó declarar sobre su etapa como terapeuta de la menor. No obstante, este Foro, en aras de llegar a una determinación justa y limitar las controversias, no ha tomado en consideración dicho testimonio en la evaluación de este caso.
La apelante nos señala en su quinto error que incidió el Tribunal de Primera Instancia al haberla privado de la custodia de la menor por su incomparecencia a una vista.
La apelante se refiere a los eventos posteriores a una vista celebrada el 22 de enero de 2002. Conforme reseñamos en la Parte I de esta Sentencia, a dicha vista no compareció ni la apelante ni su abogado. Ante el pedido del apelado de que se le concediera la custodia provisional de la menor, el tribunal apelado celebró la vista. La prueba testifical consistió de la Marie Gordillo, Trabajadora Social del Programa de Relaciones de Familia y del apelado. Se sometieron, a su vez, las evaluaciones siquiátricas del Dr. Harry Valcárcel Báez, Siquiatra de la Clínica de Diagnóstico del Tribunal.
Mediante Resolución emitida al efecto el 22 de enero de 2002, notificada en igual fecha, el Tribunal de Primera Instancia declaró Con Lugar la petición del apelado señalando que la apelante “ha demostrado una completa indiferencia a cumplir con las órdenes de este Tribunal y pone en riesgo la salud emocional de la menor”. (Véase, pág. 89 del Apéndice.)
Insatisfecha, la apelante presentó reconsideración del dictamen emitido. En vista celebrada el 20 de febrero de 2002, el Tribunal de Primera Instancia, entre otros extremos, denegó reconsiderar su dictamen. Sin embargo, aclaró dicho foro que su determinación no descansaba sólo en cuanto al incumplimiento de la apelante, sino en su función de parens patrie. (Véase, págs. 95-99 del Apéndice.)
Observamos que la determinación del foro de instancia, contrario a lo argüido por la apelante, descansó en los testimonios vertidos en dicha vista, a saber, la Trabajadora Social del Programa de Relaciones de Familia y del apelado. A su vez, el tribunal a quo consideró las evaluaciones siquiátricas del Dr. Harry Valcárcel Báez. Este Tribunal, a su vez, evaluó los testimonios y documentos y entiende que actuó correctamente el foro de instancia al otorgarle la custodia es esa etapa al apelado. El bienestar de la menor así lo requería.
*475 En su consecuencia, concluimos que no incidió el tribunal a quo al determinar que en el mejor interés de la menor, ésta debía permanecer-bajo la custodia del apelado. En síntesis, tomando como norte las disposiciones legales y la jurisprudencia antes reseñada, el balance más racional y justiciero apunta a que la custodia de la menor debe otorgársele al apelado.
En el caso de autos hemos examinado cuidadosamente la Transcripción de la Prueba, así como el expediente y los autos originales, y somos de opinión que el dictamen del Tribunal de Primera Instancia se sostiene del análisis de los mismos. Entendemos que el panorama era el adecuado y cónsono al mejor bienestar de la menor en su desarrollo físico, intelectual y emocional. Tomando en consideración lo antes mencionado, no podemos concluir que exista razón alguna que nos mueva, en esta etapa, a concederle la custodia de la menor a la apelante. Abona a nuestra determinación, el tiempo transcurrido y un Informe suscrito el 6 de diciembre de 2004, por el doctor Luis M. Sánchez Caso. 
Por último, conforme hemos apuntado en otras ocasiones, es indiscutible que el mejor bienestar de los menores está en un hogar con ambos padres, siempre y cuando sea una relación estable y de armonía. De no existir ese escenario, lo ideal sería una custodia compartida. Ese es el ideal. Lamentablemente, en un gran porcentaje de los casos ello no se logra y es en estas ocasiones en que los Tribunales tenemos que asumir la difícil y delicada tarea de determinar con cuál de los progenitores están salvaguardados los mejores intereses de los menores, tanto en el aspecto físico como emocional. En el caso que hoy atendemos, hemos realizado una evaluación meticulosa de la prueba presentada por una y otra parte. La ponderación de cada uno de los aspectos presentados ante nuestra consideración nos lleva a determinar, sin temor a equivocarnos, que el mejor interés de la menor se ve protegido manteniendo su custodia con el apelado y las relaciones materno-filiales con la apelante conforme se han estado desarrollando.
VI
Por los fundamentos antes expuestos, se confirma la Sentencia apelada.
Así lo acordó y manda el Tribunal y lo certifica la Secretaria General.
Laura M. Vélez Vélez
Secretaria del Tribunal de Apelaciones